1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Luis Noe Miramon, | ) | No. CV 11-136-TUC-JGZ (HCE) |
| Petitioner, | ) ) | **REPORT & RECOMMENDATION** |
| vs. | ) ) ) | |
| Charles Ryan, Director of the Arizona Department of Corrections; et. al., | ) ) ) | |
| Respondents. | ) ) ) | |
| | ) | |

Pursuant to the Rules of Practice of this Court, this matter was referred to the undersigned Magistrate Judge.

Pending before the Court is Petitioner's Petition for Writ of Habeas Corpus and Supporting Memorandum of Law (hereinafter "Petition") (Doc 1).  Respondents filed an Answer (Doc. 12), and Petitioner filed a Reply (Doc. 16). The Court subsequently requested Respondents to submit a transcript of an April 28, 2005 pre-trial hearing before the state court as well as the transcript of the respective parties' closing argument.  (*See* Doc. 17 (Order requesting transcripts); Doc. 18 (Notice of Filing (hereinafter "NOF") the requested transcripts)).  For the following reasons, the Magistrate Judge recommends that the District

Court deny Petitioner's Petition.

I.      **FACTUAL & PROCEDURAL BACKGROUND**

    **A.      The State Criminal Proceeding**

        **1.      State Charges and Conviction**

The Arizona Court of Appeals summarized the facts of Petitioner's case as follows:

> On the evening of August 22, 2004, [Petitioner] and two other men left a party at a Famous Sam's bar and were crossing Irvington Road on foot as Bright B. and his family drove past them.  Bright made eye contact with [Petitioner], who pointed a gun at Bright's van.  Bright continued to drive past the men who had crossed the street to the nearby AM/PM convenience store.  At the convenience store, Reginald W. exited his car that was parked at a gas pump. One of his two passengers, Batin D., was sitting in the front passenger seat, and Batin's brother Muhammed, was sitting in the back. [Petitioner] walked in front of the car and said something just before he pulled a gun from his waistband and fired a single shot through the windshield, hitting Batin in the head.  Muhammed got out of the back seat and exchanged several shots with [Petitioner], who ran off with the other two men.  Reginald and Muhammed then drove Batin to a hospital where he was later pronounced dead.  A subsequent medical examination found Batin had been killed by a single gunshot to the head.
>
>       On August 23, 2004, an anonymous caller to 911 reported that someone with the nickname "Pee Wee" had committed the shooting.  The police reviewed a video recording taken at Famous Sam's on the night of the shooting and cross-referenced it with a list of men they knew to be nicknamed Pee Wee. As a result, they included [Petitioner] in photographic lineups presented to Reginald, Muhammed, and Bright.  Both Reginald and Muhammed identified [Petitioner] from the lineups.  Bright failed to identify [Petitioner] from the lineups, but sometime later recognized him in a televison newscast about the shooting.

(Answer, Exh. A, pp. 2-3).

On September 23, 2004, Petitioner was charged by Indictment with the following:

(1) First Degree Murder, a Class 1 Felony; (2) Discharge of a Firearm at an Occupied

Structure, a Class 3 Dangerous Non-Repetitive Felony (Count 2); (3) Aggravated Assault

with a Deadly Weapon/Dangerous Instrument, a Class 3 Dangerous Felony; (4) Aggravated Assault with Deadly Weapon/Dangerous Instrument, a Class 3 Dangerous Felony; (5) Endangerment, a Class 6 Dangerous Felony; (6) Endangerment, a Class 6 Felony; and (7) Possession of a Deadly Weapon by Prohibited Possession, a Class 4 Felony. (Answer, Exh. B; *see also* Answer, Exh. C). Petitioner successfully moved to sever the charges of Discharge of a Firearm at an Occupied Structure and Possession of a Deadly Weapon by Prohibited Possessor. (Answer, Exh. A, p.2 n.1). A jury found Petitioner guilty of the remaining charges. (*Id.* at p.2).

On September 30, 2005, the trial court sentenced Petitioner to the following: (1) life without the possibility of parole for 25 years for First-Degree Murder (Count 1); (2) 7.5 years, a presumptive term, for Aggravated Assault (Count 2); (3) 7.5 years, a presumptive term, for Aggravated Assault (Count 3); (4) 2.25 years, a presumptive term, for Endangerment (Count 4); and (5) 2.25 years, a presumptive term, for Endangerment (Count 5). (Answer, Exh. C). The trial court set the sentences for Counts 1, 3, and 5 to run concurrent with each other. (*Id.*). The trial court further ordered that the sentence for Count 2 shall be served consecutively to Count 1 and that the sentence for Count 4 shall be served consecutively to the sentence imposed in Count 2. (*Id.*).

## 2.    **Direct Appeal**

Petitioner directly appealed his convictions, arguing that: (1) the trial court erred by denying his motion for a new trial; (2) the trial court erred by permitting Bright to identify him at trial; (3) the prosecutor committed misconduct because, when compiling the photographic lineups, approximately 1 year before trial, the police did not include a photo

of a man named Miguel Cervantes[1]; (4) the trial court erred by denying his motion to dismiss; (5) the trial court violated his Confrontation Clause rights by admitting testimony about the anonymous 911 call; and (6) the trial court erred by denying his motion for mistrial. (Answer pp. 3-4 & Exh. A).   On September 27, 2007, the Arizona Court of Appeals denied Petitioner's direct appeal on the merits. (*Id.*).  Petitioner did not seek review of that decision. (Petition, p. 3; Answer, p. 4).

### 3.    Petition for Post-Conviction Relief

On October 12, 2007, Petitioner initiated post-conviction relief proceedings. (Answer, Exh. E).   In his Petition for Post-Conviction Relief (hereinafter "PCR Petition"), filed through counsel, Petitioner argued that his trial counsel had rendered ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668 (1984), by advising Petitioner to reject the State's plea offer of "a charge of Manslaughter with a range of sentence of 7 years (mitigated term), 10 years (presumptive term), and 15 years (aggravated term)." (Petition, Exh. 1, p. 1).  After conducting an evidentiary hearing on the matter, the trial court denied Petitioner's PCR Petition. (Answer, Exh. G).  Petitioner sought review of the trial court's decision, and the appellate court granted review but denied relief. (Answer, Exh. H).  On March 4, 2010, the Arizona Supreme Court summarily denied review. (Answer, Exh. I).

### B.    Federal Petition for Writ of Habeas Corpus

Petitioner, through counsel, raises the following grounds in his Petition for Writ of

---

[1]Petitioner's primary defense was mistaken identity.   (Answer, Exh. A, p. 3). Petitioner maintained that another man, Miguel Cervantes, was the shooter.  (*Id.*; *see also* NOF, Exh. K, pp. 40-44).

Habeas Corpus:

> 1.    violation of his Sixth Amendment right to effective assistance of counsel at the time of the plea negotiation (Ground I); and
>
> 2.    the trial court's denial of Petitioner's PCR Petition violated his Fourteenth Amendment right to due process (Ground II).

(Petition).

Respondents concede that the Petition is timely filed and that Petitioner has properly exhausted his claims.  (Answer, pp. 4, 7).  Respondents contend that the Petition is without merit and should be denied.

## II.    DISCUSSION

### A.    Standard: Review of a Claim on the Merits

Pursuant to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court may grant a writ of habeas corpus only if the state court proceeding:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). Section 2254(d)(1) applies to challenges to purely legal questions resolved by the state court and section 2254(d)(2) applies to purely factual questions resolved by the state court. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004). Therefore, the question whether a state court erred in applying the law is a different question from whether

it erred in determining the facts. *Rice v. Collins* 546 U.S. 333 (2006).

Section 2254(d)(1) consists of two alternative tests, i.e., the "contrary to" test and the "unreasonable application" test. *See Cordova v. Baca*, 346 F.3d 924, 929 (9th Cir. 2003). Under the first test, the state court's "decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003)(*citing Williams v. Taylor*, 529 U.S. 362, 413-14 (2000)). Additionally, a state court's decision is "'contrary to' Supreme Court case law if the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases."[2] *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) (*quoting Early v. Packer*, 537 U.S. 3, 8 (2002)). "Whether a state court's interpretation of federal law is *contrary* to Supreme Court authority...is a question of federal law as to which [the federal courts]...owe no deference to the state courts." *Cordova*, 346 F.3d at 929 (emphasis in original)(distinguishing deference owed under the "contrary to" test of section (d)(1) with that owed under the "unreasonable application" test).

Under the second test, "'[a] state court's decision involves an unreasonable application of federal law if the state court identifies the correct governing legal

---

[2]"[T]he *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412...While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark*, 331 F.3d at 1069 (emphasis in original).

principle...but unreasonably applies that principle to the facts of the prisoner's case.'" *Van Lynn*, 347 F.3d at 738 (*quoting Clark*, 331 F.3d at 1067). Under the "unreasonable application clause...a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly....Rather that application must be objectively unreasonable.'" *Clark*, 331 F.3d at 1068 (quoting *Lockyear v. Andrade*, 538 U.S. 63 (2003)). When evaluating whether the state decision amounts to an unreasonable application of federal law, "[f]ederal courts owe substantial deference to state court interpretations of federal law...." *Cordova*, 346 F.3d at 929.[3]

Further, a federal habeas court can only look to the record before the state court in reviewing a state court decision under section 2254(d)(1). *Cullen,* __ U.S. at __, 131 S.Ct. at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of §2254(d)(1) on the record that was before that state court.")(footnote omitted); *Holland v. Jackson*, 542 U.S. 649, 652 (2004)("[W]e have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it.")(citations omitted).

Under section 2254(d)(2), which involves purely factual questions resolved by the state court, "the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the

---

[3]Section 2254(d) applies even where there has been a summary denial. *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1402 (2011). In such circumstances, the petitioner can satisfy the "unreasonable application" prong of section 2254(d)(1) "only by showing that 'there was no reasonable basis' for the..." state court's decision. *Id.* (*quoting Harrington v. Richter,* 562 U.S. __, 131 S.Ct. 770, 784 (2011)).

record." *Lambert*, 393 F.3d at 978: *see also Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.), *cert. denied* 543 U.S. 1038 (2004)("a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable."). Section (d)(2) "applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence,...that the process employed by the state court is defective...or that no finding was made by the state court at all." *Taylor*, 366 F.3d at 999 (citation omitted). In examining the record under section 2254(d)(2), the federal court "must be particularly deferential to our state court colleagues...[M]ere doubt as to the adequacy of the state court's findings of fact is insufficient; 'we must be satisfied that *any* appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Lambert*. 393 F.3d at 972 (quoting *Taylor*, 366 F.3d at 1000)(emphasis in original).

Once the federal court is satisfied that the state court's fact-finding process was reasonable, or where the petitioner does not challenge such findings, "the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, *i.e.*, evidence presented for the first time in federal court."[4] *Taylor*, 366 F.3d at 1000: *see also* 28 U.S.C. §2254(c). Factual and credibility

---

[4]Under the AEDPA "a determination of a factual issue made by a State court shall be presumed to be correct" and the presumption of correctness may be overcome only by clear and convincing evidence. 28 U.S.C. §2254(e)(1).  The "AEDPA spells out what this presumption means: State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and

determinations by either state trial or appellate courts are imbued with a presumption of correctness. 28 U.S.C. §2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002); *Bragg v. Galaza*, 242 F.3d 1082, 1078 (9th Cir. 2001), *amended* 253 F.3d 1150 (9th Cir. 2001). Furthermore, factual assertions made in support of properly exhausted claims in state court cannot be altered or expanded upon without permission of the federal habeas court. *See Baja v. Ducharme*, 187 F.3d 1075, 1079 (9th Cir. 1999).

Both section 2254(d)(1) and (d)(2) may apply where the petitioner raises issues of mixed questions of law and fact. Such questions "receive similarly mixed review; the state court's ultimate conclusion is reviewed under section 2254(d)(1), but its underlying factual findings supporting that conclusion are clothed with all of the deferential protection ordinarily afforded factual findings under §§ 2254(d)(2) and (e)(1)." *Lambert*, 393 F.3d at 978.

### B.    Petitioner's Grounds I and II

In Ground I, Petitioner cites evidence and authority to support his contention that defense counsel's representation with regard to the plea was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  (*See* Petition, pp. 14-26).  In Ground II, Petitioner takes issue with the trial court's decision denying his claim of ineffective assistance of counsel with regard to the plea.  (*See id.* at pp. 26-32).  The portion of the Petition directed to the trial court's rulings essentially argue that the rulings were contrary

---

convincing proof that the state-court finding is in error....Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once..." it is found that the state court reasonably determined the facts in light of the evidence presented in the state proceeding. *Taylor*, 366 F.3d at 1000.

to, or involved an unreasonable application of, Supreme Court precedent and/or unreasonably determined the facts in the light of the record.  (*See id.* at pp. 26-32).  Respondents correctly point out that Petitioner's second claim is not "in actuality a separate claim....Rather...that is the standard of review..." under the AEDPA. (Answer, p. 7; *see also supra,* at II.A.).

Petitioner claims that counsel rendered ineffective assistance by: failing to "accurately or adequately inform Petitioner of the strengths of the State's case....", "downplay[ing] the strengths of the State's case and consistently and vastly overemphasiz[ing] the strength of the defense of mistaken identification"; advising Petitioner to reject the plea despite counsel's knowledge of facts and evidence rendering the misidentification defense "not supportable and highly unrealistic"; and giving advice to Petitioner that "did not address the actual benefits of the plea offer in comparison to Petitioner's unrealistic chances at trial and the consequences of being convicted at trial."  (Petition, pp. 20, 23, 25).

### 1.    The state court proceeding

#### a.    Pre-Conviction

The State made a plea offer to a reduced charge of Manslaughter with a sentencing range of 7 to 15 years, with 10 years as the presumptive sentence, and all other charges would be dismissed.  (Petition, p.12 & Exh. 1-A).

At an April 28, 2005 pre-trial hearing, the State informed the court that Petitioner had indicated his intention "not [to] take the plea today" and the state requested a *Donald* hearing.[5] (NOF, Exh. J, p.2).  Defense counsel, Eric Larsen, responded that the case had not

---

[5]Arizona courts conduct a *Donald* hearing to ensure that the defendant has been informed of the content of the State's plea offer, where one has been made, and that the

been set for a change of plea hearing for that day, the defense had only received the plea the day before, and the State's evidence was not complete with the "key issue" being whether Ernesto Leal was going to testify at Petitioner's trial. (*Id.* at pp. 2-3). According to the State, Mr. Leal would testify that Petitioner bragged about the "murders", and Mr. Leal had information "about what Mr. Miramon did with the murder weapon." (*Id.* at p.4).[6]   It was Mr. Larsen's position that "up until Mr. Leal makes a decision[,] his evidence is either in or out, if...his evidence is out...the state of the case is significantly different than whether he makes a decision to testify." (*Id.* at p. 3).   Mr. Larsen further stated:

> [W]hat should not be part of the guessing game is whether the key piece of evidence comes in.  From the defense point of view, the State has an incredibly weak case, and I know Mr. Locke [the prosecutor] disagrees with that, but that's from the defense point of view.  And, therefore, I'm advising my client in, light of our interpretation of all of the evidence, Mr. Leal changes that, because it's certainly possible that a jury could believe him despite all the problems that he brings, it is possible a jury could believe him.  And if they do, my client goes down for the rest of his life.  He needs to know before he makes a decision as to between serious–seven to 15 and life–what he's going to do. It's just fairness.

(*Id.* at p. 8).

At the hearing, the prosecutor was clear that if Mr. Leal decided to testify, "this plea is no longer valid....So I'm not authorized to offer this plea once we secure Mr. Leal's testimony, so if Mr. Larsen is going to play the waiting game and see if I secure Mr. Leal's

---

defendant understands the consequences of a decision to reject the offer.  *See State v. Donald,* 198 Ariz. 406, 10 P.3d 1193 (App. 2000).

[6]In his pending habeas Petition, Petitioner states that before turning himself in after the shooting, he resided at the home of Mr. Leal's girlfriend, and during that time he "made numerous highly incriminating and damaging statements to Mr. Leal about what had happened, how the shooting came about, what Mr. Miramon's involvement had been, etc., including the fact that Mr. Miramon was the shooter."  (Petition, p. 22).

testimony then the plea won't be available.  Another plea might be available but it won't be this one.  So that's the risk...he has to take." (*Id.* at p. 9).  The prosecutor agreed to hold the plea open until the following week.  (*Id.* at pp. 9-10).  The court set the matter for "a continued status conference, potential for change of plea..." for the following week.  (*Id.*).

When the matter came on for hearing the following week on May 5, 2005, Mr. Larsen reminded the court that  "the sticking point" regarding Petitioner's decision whether he would accept the plea was whether Mr. Leal was going to testify.  (Petition, Exh. 1-B, pp. 7-8).  Mr. Larsen stated that he had learned that Mr. Leal would not be testifying at Petitioner's trial and "[b]ased on that information, my client has indicated to me that he will not be accepting the State's plea offer of manslaughter, 7 to 15 years." (*Id.* at p. 8).  Mr. Larsen advised the court that the had

> explained to [Petitioner] the consequences that if he goes to trial and loses, worst case scenario, on the first degree homicide charge, that he could be looking at natural life.  The Court could also give him life with parole after 25, but [sic] can't count on that in this evaluation.  He needs to consider that this is literally a life decision.  And I believe he understands the consequence.  I've certainly gone over with him at length the status of the evidence and the way it is going to play out as of today.

(*Id.*).

Asking direct questions of Petitioner, the court confirmed that Petitioner understood that "just as to the charge of first degree murder, the only possible sentence, if you're convicted, is either 25 years to life or natural life, which means that you'll never leave prison, do you understand that?", to which Petitioner responded: "I understand." (*Id.*).  The court went on to state that the plea offer "with a range as little as 7 years, and up to 15 years...[was] a whole lot less than if you receive life or natural life; do you understand that?", to which

Petitioner answered: "I understand." (*Id.* at p. 9). The court advised "that no matter how things start out before trial, that things can change during a trial. And oftentimes people get surprised at the way a trial changes while it's underway. So, if you're thinking you've got a slam-dunk winner in this case, you understand that that could reverse very quickly and you are not going to have an opportunity to change your mind after today; do you understand that?", to which Petitioner responded: "Yes." (*Id.*). The court then discussed an array of possible sentences on the pending counts, including the finding of aggravating factors and the imposition of consecutive sentences, and Petitioner indicated that he understood what he was facing should he be convicted. (*Id.* at pp. 9-12). The court stressed that this was "going to be the last time that the State makes this plea available to you," and Petitioner responded: "I understand." (*Id.* at p. 12). The court gave Petitioner an opportunity to speak with defense counsel, which Petitioner declined. (*Id.*). The court then asked Petitioner: "Then is it your final decision that you do not wish to take the State's plea offer?", to which Petitioner responded: "Final decision." (*Id.* at pp. 12-13). Thereafter, the court found that Petitioner's decision to reject the plea offer was made knowingly and intelligently. (*Id.* at p. 13).

### b.      Post-conviction Relief Proceeding

Petitioner's PCR Petition, which was filed through counsel, claimed ineffective assistance of trial counsel during plea negotiation. (Petition, Exh. 1). In support of his PCR Petition, Petitioner submitted, *inter alia*, his own affidavit and affidavits from his brother, Alberto Peralta, and his fiancé, Karla Martinez. (*Id.*). Thereafter, the trial court held an evidentiary hearing and heard testimony from the following witnesses: Mr. Larsen; Defendant; Defendant's brother, Mr. Peralta; and Defendant's fiancé, Ms. Martinez.

(Petition, Exhs. 8-A, 8-B).

The testimony indicated that prior to the instant case, Mr. Larsen had represented Petitioner on another matter[7] and Petitioner accepted a plea in that previous case to 3½ years in prison. (Petition, Exh. 8-B, pp. 17-18, 42). Petitioner was satisfied with Mr. Larsen's previous representation and, based on this previous experience with Mr. Larsen, he requested that his family retain Mr. Larsen to represent him with regard to the instant case. (*Id.* at p. 43). Petitioner testified that he trusted Mr. Larsen "with my life, so, I depended on him." (*Id.*). Mr. Larsen testified that before Petitioner self-surrendered to authorities in the instant case, Petitioner met Mr. Larsen at the crime scene and "[g]ave me a version of events....We talked during that walk- thru about what he could be charged with...And then, as that version of events didn't coincide with what was in the disclosure that was given after [Petitioner] was arrested...I got subsequent versions of events and greater information from him."[8] (*Id.* at p. 10; *see also Id.* at p. 21 ("Out at the scene, during the walk-thru, he gave me a version of events that he later recanted while in custody, and modified a couple of different times as evidence began to come out from the State.")). Mr. Larsen testified that he did not "believe that [Petitioner] ever formally admitted [to Mr. Larsen] that he was, in fact, the shooter." (*Id.* at p.22).

Mr. Larsen testified that he discussed with Petitioner "the pros and cons of trial" and "the strengths and weaknesses of the State's case." (*Id.* at p. 11). According to Mr. Larsen,

---

[7]The record suggests that the previous matter involved charges of aggravated assault and sale of narcotics. (*See* Petition, Exh. 8-B at pp. 17-18, 42).

[8]Mr. Larsen testified: "The advantage I had is that I don't believe [Petitioner] gave [the inconsistent versions of events]...to the State." (Petition, Exh. 8-B, p. 25).

Petitioner "wavered back and forth as to how he wanted to proceed, but the bottom line was that he didn't want to go to prison." (*Id.*).   Mr. Larsen had informed Petitioner: that Petitioner "could get 25 years to life"; the range for manslaughter; and the range for all levels of homicide. (*Id.* at pp. 8-9). Mr. Larsen had "no idea" how many times he met with Petitioner during the course of the case, but he "probably" met with Petitioner more than ten times. (*Id.* at p. 9). Typically, he would meet on a regular basis with a client charged with first-degree murder. (*Id.*). Mr. Larsen discussed the plea offer with Petitioner. (*Id.*). Mr. Larsen testified that he did not encourage Petitioner to reject the plea. (*Id.* at p. 15; *see also id.* at p.30 ("I don't sit there and tell a client what he needs to do. I've had clients take pleas that I wouldn't have recommended they take...because it would have been harsher than what I thought I could get. But, you know, that's the client's decision and choice, based on facts and circumstances and advice that I give them as to a reasonable likelihood of success at trial versus where the Judge is going to fall within the plea.").

Mr. Larsen testified that he did not offer predictions about the outcome of trial to Petitioner or Petitioner's family, although he and Petitioner had discussions about whether "we had a good chance versus a bad chance, versus no chance, we had those discussions. And they varied as things developed in the case." (*Id.* at p. 13). Sometimes, Mr. Larsen will mention numbers when discussing his assessment of a case. (*Id.* at p. 14). Mr. Larsen's "assessment of the case was that it was a pretty decent defense case, provided that the State continued to miss one of the key pieces of evidence, [that being a photo of Petitioner's shirt at the crime scene], which they did, throughout the entire case." (*Id.* at p.13; *see also id.* at p. 26 ("we went in thinking we had a pretty good shot at trial.")). Mr. Larsen was "sure I

would have gone through the evidence with [Petitioner], and indicated that he did have a chance of winning.  I don't know with [Petitioner] whether I put a percentage on it or not, I don't recall specifically doing that."  (*Id.* at p. 24).  Mr. Larsen stressed that he lets his clients know the outcome of trial is not guaranteed.  (*Id.* at p.16).

Mr. Larsen did not disagree that in his closing argument at Petitioner's trial, he argued: (1) misidentification, in that Miguel Cervantes was the true shooter; (2) that there was no video at the AM/PM or any other nearby location indicating Petitioner was "involved with the shooter"; (3) that there were no fingerprints or footprints; and (4) that there was no clothing linking Petitioner to the crime.  (*Id.* at p.23; *see also id.* at p. 26 (Mr. Larsen relied on "[a] lack of evidence claim...."))Mr. Larsen could not recall whether he knew that Mr. Cervantes could not have been the shooter because a witness had seen him leave the Famous Sam's on a motorcycle and, thus, he was not present at the AM/PM where the shooting occurred.  (*Id.* at p. 25).  Mr. Larsen testified that the information was "one piece of evidence....[P]ieces of evidence aren't always true.  So you don't rely solely on one piece of evidence." (*Id.*).  Mr. Larsen "had a pretty good idea, based on conversations with my client, that Mr. Cervantes was not the shooter."  (*Id.* at p.26).

Petitioner testified that he never told Mr. Larsen that he would not go to prison.  (*Id.* at p. 43).  Petitioner testified that when he first met with Mr. Larsen at the scene, he told Mr. Larsen that he had a gun and that he had "fired one shot, because they pulled out a gun on me.... And he said leave everything up to him."  (*Id.* at p. 45; *see also id.* at p.46  (Petitioner indicated he made it clear to Mr. Larsen that he was the shooter)).

Petitioner testified that the misidentification defense was Mr. Larsen's idea.  (*Id.* at

p. 46).  Petitioner testified that he told Mr. Larsen that Mr. Cervantes left Famous Sam's before the shooting at the AM/PM.  (*Id.* at p. 48).  During their conversations, Mr. Larsen told Petitioner  the State had "no evidence, not to worry about nothing, to let him do what he does."  (*Id.*).

Petitioner testified that Mr. Larsen showed him the State's plea offer and said it was for manslaughter, with a sentencing range of seven to fifteen years.  (*Id.* at p.49). Petitioner testified that when Mr. Larsen discussed the State's plea offer with him, Mr. Larsen said that "they're going to give you a week to sign this....[W]e're going to give them the plea back, going to tell them we don't want this plea, we're going to go to trial.  And it was set from there." (*Id.* at pp. 48-49).  Petitioner testified that before the *Donald* hearing, Mr. Larsen told him "[n]ot to waffle about not wanting to go to trial, that I wanted to go to trial.  And...that I didn't want to sign the plea, to make it clear."  (*Id.* at p. 53).  Petitioner also stated in his affidavit filed in support of his PCR petition that "Mr. Larsen cautioned me not to accept any offer of advice from another attorney if such an offer was made.  He told me that he did not want any other attorney to be involved with the case."  (Petition, Exh. 1-C, ¶12).

Petitioner also testified that if counsel had told him that the "best thing for you..." was to take the plea, Petitioner would have accepted the plea.  (*Id.* at p. 50).  According to Petitioner, Mr. Larsen, instead, told him "not to worry....[Mr. Larsen] was even telling my family, he had my family thinking I was going to walk on this."  (*Id.*).  In Petitioner's affidavit filed in support of his PCR Petition, Petitioner stated that "[a]s the case developed, Mr. Larsen told me that this was going to be an easy case to win, because the State's witnesses were lying, and he could prove it.  He told me that the evidence the State had was

- 17 -

not enough to convict me....He was extremely confident about winning the trial." (Petition, Exh. 1-C, ¶¶5-6). Petitioner also stated that Mr. Larsen did not explain "the comparative differences between the plea and trial, especially with regard to the realistic chances of success at trial." (*Id.* at ¶11). Nor, according to Petitioner, did Mr. Larsen explain that if Petitioner accepted the plea, he would have the opportunity to present mitigating evidence which might result in a sentence reduction to a term less than the maximum under the plea. (*Id.* at ¶10).

At the evidentiary hearing, Petitioner testified that he rejected the plea because he trusted Mr. Larsen. (Petition, Exh. 8-B, pp. 57-58). Although Petitioner knew he had the right to take the plea, he rejected it because Mr. Larsen "didn't want me to take it." (*Id.* at p. 55). When Petitioner's PCR counsel asked whether it was Petitioner's testimony that "your lawyer was forcing you not to take the plea?", Petition responded: "Yeah." (*Id.* at pp. 55-56).

Petitioner testified that Mr. Larsen would not give him the police reports or other paperwork despite Petitioner having asked for same, Mr. Larsen did not discuss the evidence with him, nor did he discuss witnesses' expected testimony. (*Id.* at pp. 50-51). Petitioner also denied that Mr. Larsen met with him ten times. (*Id.* at pp. 54-55). Instead, Mr. Larsen came to the jail about five times. (*Id.* at p. 55). Petitioner initially testified that he "just knew...[the witnesses] were going to be there and they were going to say something. But I didn't know exactly what they were going to say." (*Id.* at p. 51). Had Mr. Larsen gone through the reports with Petitioner and told Petitioner what the witnesses would testify to, Petitioner would have accepted the plea offer. (*Id.; see also* Petition, Exh. 1-C). On cross-

examination, Petitioner testified:

> [Mr. Larsen] told me...[the witnesses] were going to come to court, going to say it was me.  But he didn't tell me specifically, like, when the victim's brother got on the stand and started saying things about me that I never, me or my family never heard before until that day.  They just made the evidence look real bad.

(Petition, 1-B, pp. 56-57).  On cross-examination, Petitioner was also asked:

> Q.[prosecutor]:     So you did know that somebody was going to sit on the witness stand at your trial, point at you, and say that was the guy with the gun?
>
> A. [Petitioner]:       Yeah.

(*Id.*).

Petitioner's older brother, Mr. Peralta, testified that Petitioner had been satisfied with Mr. Larsen's representation in the past.  (Petition, Exh. 8-A, p. 9).  With regard to the instant case,   Petitioner told Mr. Peralta that he trusted Mr. Larsen and he would make whatever decision Mr. Larsen wanted him to make.  (*Id.* at p. 12).

Mr. Larsen told Mr. Peralta "that the State had very little evidence, and the evidence that they did have did not substantiate the charges that the State was putting against [Petitioner].  And to take a plea at this time would be ridiculous."  (*Id.* at p.9; *see also id.* at p.10 (Mr. Larsen "didn't go into specifics, exactly what the evidence was, but he emphasized that the evidence they did have was very weak."))[9].  Mr. Larsen "said we have an 85 percent

---

[9]In his affidavit filed in the PCR proceeding, Mr. Peralta stated that Mr. Larsen was "adamant that [Petitioner] should go to trial....[O]ne occasion when we met at Mr. Larsen's office and discussed the case, including the plea offer, for Manslaughter rather than First Degree murder,...Mr. Lars[e]n during this time said this was a simple, clear-cut case and he thought it would be ridiculous to accept the State's plea offer....He said, "'We're going to take this to trial.'"  (Petition, Exh. 1-D, ¶¶4-5).  Mr. Larsen testified that he reviewed Mr. Peralta's affidavit and he believed that Mr. Peralta "sort of jumbles up the facts....I'm not saying his memory is incorrect in that the statement, at least, of, we're going to tell [the

- 19 -

chance of beating the State." (*Id.* at p. 10; *see also id.* at p. 14 (Mr. Larsen never guaranteed a hundred percent chance of winning the case)).

Petitioner's fiancé, Ms. Martinez, testified that Mr. Larsen told her "not to worry about it, he knew what he was doing, and the State's evidence was weak, that it was a clear-cut case for him to win." (Petition, Exh. 8-B at p. 34; *see also id.* at p. 36)).   Mr. Larsen also said the probability of success at trial was 85 percent. (*Id.* at p. 35).   Although Mr. Larsen never discussed the strengths of the State's case, he pointed out the weaknesses: no murder weapon, nothing pointed to Petitioner at the crime scene, and he also discussed the misidentification defense. (*Id.* at pp. 39-40).   Ms. Martinez was not present during discussions between Mr. Larsen and Petitioner. (*Id.* at p. 40).

On January 22, 2009, the trial court denied Petitioner's PCR Petition as follows in pertinent part:

> Trial Counsel was...competent and seasoned.  Mr. Larsen's testimony was credible. This Court concludes that Mr. Miramon had been advised of the relative risks versus benefits concerned with proceeding to trial as opposed to the acceptance of the State's offer to plead to Manslaughter.  Those risks were discussed at length by the Court and Counsel on April 28, 2005 and May 5, 2005.
>
> While counsel for Petitioner has rightfully focused on trial counsel's

prosecutor]...we're going to trial, I believe he actually heard me say that.  But I believe that was in reference to a plea to a second degree.  And I felt there wasn't that much of an advantage between a first and second degree outcome.  I also felt that [the prosecutor]...was bluffing on that offer and that we could get better if need be." (Petition, Exh. 8-B, pp. 27-28).  According to Mr. Larsen, he "would have told Mr. Miramon that, number one, we could do better, if that [second degree murder] had been the plea that had been formally offered, and to give me an opportunity to do better before he made a decision.  But I don't sit there and tell a client what he needs to do." (*Id.* at p. 30). Mr. Larsen clarified that "[t]here had been a second degree discussion, no offer." (*Id.* at p. 28).  He also pointed out that the State subsequently made a better offer, which was the plea that Petitioner ultimately rejected at the *Donald* hearing. (*Id.* at p. 30).

extremely confidant remarks in Court on April 28, 2005, it was the very same exuberance which caused this Court to carefully explain to the defendant how quickly fortunes could reverse at trial. *See* pp's 7-8 RT of April 28, 2005. See also pp's 8-9, RT of May 5, 2005.

Notwithstanding Mr. Larsen's "puffing" with the prosecutor on those occasions he finished those discussions by making it clear that he had, indeed made Mr. Miramon bluntly aware of the worst case scenario at trial.
***

Trial Counsel's testimony at the hearing was corroborated by the record. The defendant was informed that it was his life at stake and his ultimate decision to make.

THE COURT FINDS that Mr. Miramon had all of the tools and all of the information necessary to make that difficult decision. Hindsight is 20-20 and all humans wish we had the benefit of it. Unfortunately, we do not.

(Answer, Exh. G).

In affirming the trial court, the appellate court cited *Strickland*. (Answer, Exh. H, pp. 2-3). The appellate court acknowledged Petitioner's argument that Mr. Larsen "painted an unrealistic and unreasonably optimistic picture of [Miramon's] trial prospects with no advice regarding strengths of the State's case or weaknesses in the defense theory, and never describing the actual benefits of accepting the plea offer." (*Id.* at p.2). And, thus, according to Petitioner, his reliance on Mr. Larsen's "misadvice regarding the plea..." resulted in Petitioner's "uninformed and involuntary decision to proceed to trial..." instead of accepting the plea offer. (*Id.*) (citation omitted).

The appellate court pointed out that at the *Donald* hearing,

after the state clarified that one of its key witnesses would not be testifying at trial; Miramon decided to reject the state's plea offer; Larsen told the court that he had explained the consequences of that decision to his client. The court then questioned Miramon in detail about his decision not to plead guilty and required a verbal response to every question it asked to verify Miramon understood the consequences of his decision. The court later described the *Donald* hearing as having been "as thorough as would seem possible."

(*Id.* at p. 4).  The appellate court recognized that "the trial court had the right to rely on Miramon's assurances at the *Donald* hearing that he understood the consequences of rejecting the plea offer.  Merely contradicting what the record clearly shows does not entitle Miramon to relief."  (*Id.* at p. 5).  The appellate court further pointed out that, after the evidentiary hearing on the PCR Petition, the trial court expressly found Mr. Larsen was a credible witness, "as it was empowered to do." (*Id.*).  The appellate court noted Mr. Larsen's testimony that

> he had explained the sentencing ranges to Miramon for 'all levels of homicide,' the likelihood of success at trial, the 'pros and cons' of proceeding to trial, and the strengths and weaknesses of the state's case and he had not instructed Miramon to reject the state's plea offer.  Larson also testified Miramon had told him he did not want to go to prison.  Although Larsen had been confident he could succeed at trial, he did not guarantee Miramon an acquittal.  Larsen met with Miramon's family to discuss the case but did not speak as freely  with them as he had with Miramon.  Larsen also testified that he believed...[Mr. Peralta] was referring to a potential plea offer for second-degree murder rather than the actual plea offer for manslaughter when he stated in his affidavit that Larsen had said "it would be ridiculous to accept the State's plea offer."

(*Id.* at p. 6).

The appellate court also noted Petitioner's testimony that Mr. Larsen forced him to reject the plea offer and that he would have accepted the offer if Mr. Larsen had explained to him the evidence anticipated at trial.  (*Id.*).  "Although Miramon acknowledged knowing before trial that a particular witness would testify Miramon was 'the guy with the gun' at the murder scene, he claimed he 'didn't know exactly...the other things [the witness was] going to say." (*Id.* at pp. 6-7).  Additionally, the appellate court further considered the trial court's statements at the evidentiary hearing that:

"when we went over this in court [at the *Donald* hearing], I put it in pretty strong terms with Mr. Miramon that even if you think you have a slam dunk winner here, things can reverse at trial very quickly. [W]e put this pretty bluntly to Mr. Miramon at the time of the hearing."  The court added that it was concerned it might "be dealing with Monday morning quarterbacking...by Mr. Miramon."

(*Id.* at pp. 6-7).

The appellate court further noted the testimony from Petitioner's brother that Mr. Larsen had not adequately explained the plea offer to the family.  (*Id.* at p.7).  Although Petitioner's fiancé testified that Petitioner "was willing to follow Larsen's advice because he trusted him[,]" the appellate court also observed that she "acknowledged she had never been present when Miramon met with Larsen."  (*Id.*).

The appellate court held that "[t]he trial court's finding that Larsen's performance did not fall below prevailing  professional standards is fully supported by the record."  (*Id.*).

### c.    Standard for ineffective assistance of counsel claims

It is well-settled that a criminal defendant has the right to effective assistance of counsel during plea negotiations and in deciding whether to reject a plea offer.  *See Lafler v. Cooper,* __ U.S. __, 132 S.Ct. 1376, 1387 (2012)("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."); *Padilla v. Kentucky,* 559 U.S. __, 130 S.Ct. 1473, 1481 ("Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.'") (*quoting McMann v. Richardson,* 397 U.S. 759, 771 (1970)); *Hill v. Lockhart,* 474 U.S. 52, 58; *Turner v. Calderon,* 281 F.3d 851, 880 (9th Cir. 2002).  In *Strickland v. Washington*, 466 U.S. 668,687 (1984), the Supreme Court established a two-part test for evaluating ineffective

assistance of counsel claims. To establish that his trial counsel was ineffective under *Strickland*, a petitioner must show that: (1) his trial counsel's performance was deficient; and (2) trial counsel's deficient performance prejudiced petitioner's defense. *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998)(*citing Strickland*, 466 U.S. at 688, 694). The *Strickland* test also applies to ineffectiveness claims arising from the plea process. *Lafler,* __ U.S. __, 1376; *Hill,* 474 U.S. at 57-58; *Turner,* 281 F.3d at 880.

   "'[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer.'" *Turner,* 281 F.3d at 880 (*quoting United States v. Day,* 969 F.2d 39, 43 (3d Cir. 1992)).  To establish deficient performance, Petitioner must show that "counsel made errors so serious...that counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-688.  In the context of rejecting a plea offer, the question is "not whether 'counsel's advice [was] right or wrong, but...whether that advice was within the range of competence demanded of attorneys in criminal cases.'" *Turner,* 281 F.3d at 880 (*quoting McMann,* 397 U.S. at 771). In sum, "[c]ounsel cannot be required to accurately predict what the jury or court might find, but he can be required to give the defendant the tools he needs to make an intelligent decision." *Id.* at 881.

   In considering the first *Strickland* factor, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. The Ninth Circuit "h[as] explained that '[r]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation.'" *Ortiz*, 149

F.3d at 932 (*quoting Hensley v. Crist*, 67 F.3d 181, 184 (9th Cir. 1995)). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Additionally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct , and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

Even where trial counsel's performance is deficient, Petitioner must also establish prejudice in order to prevail on his ineffective assistance of counsel claim. To establish prejudice in the instant case, Petitioner must show that there is a reasonable probability that, "but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial." *Turner,* 281 F.3d at 879. Further, because failure to make the required showing of either deficient performance or prejudice defeats the claim, the court need not address both factors where one is lacking. *Strickland,* 466 U.S. at 697-700.

Additionally, under the AEDPA, the federal court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 689-699 (2002). Therefore, in order to merit habeas relief, Petitioner must make the additional showing that the state court's ruling rejecting an ineffective assistance of counsel claim constituted an unreasonable application of *Strickland*. *See* 28 U.S.C. §2254(d)(1); *see also Cullen,* __ U.S. __, 131 S.Ct. at 1403 (federal habeas court's review of state court's decision on ineffective assistance of counsel claim is "doubly deferential."); *Harrington,* 562 U.S. at __, 131 S.Ct.

at 788 ("Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.").

### d.      Analysis

The state court, in applying *Strickland,* applied the correct law to the issue. *See Dows v. Wood,* 211 F.3d 480, 484-85 (9th Cir. 2000) (*Strickland* "is considered in this circuit to be 'clearly established Federal law, as determined by the Supreme Court of the United States' for purposes of 28 U.S.C. § 2254(d) review."). "[W]here the issue is whether to advise the client to plead or not 'the attorney has the duty to advise the defendant of the available options and possible consequences' and failure to do so constitutes ineffective assistance of counsel." *United States v. Blaylock,* 20 F.3d 1458, 1465 (9th Cir., 1994) (*quoting Beckam v. Wainwright,* 639 F.2d 262, 267 (5th Cir. 1981)).   Petitioner does not dispute that Mr. Larsen advised him about the plea offer and its terms as well as the sentences he faced if he proceeded to trial.  Petitioner also conceded that he was aware witnesses at trial would testify that he was the shooter.

Although Petitioner asserts that his trial counsel overestimated the chances of success at  trial, the record is clear that he was not guaranteed that he would prevail at trial.  While Mr. Larsen did not recall whether he had quoted a percentage with regard to Petitioner's chances of prevailing at trial, he did testify that he believed "it was a pretty decent defense case", "we had a pretty good shot at trial", and that Petitioner "did have a chance of winning."  (Petition, Exh. 8-B, pp. 13, 24, 26).  This testimony is consistent with that

proffered by Petitioner's brother and Petitioner's fiancé that Mr. Larsen mentioned that Petitioner had an 85% chance of winning at trial.  It is also consistent with Petitioner's statement that Mr. Larsen was "extremely confident about winning the trial." (Petition, Exh. 1-C, ¶6).  Although Petitioner also offers his self-serving affidavit statement that Mr. Larsen told him "this was going to be an easy case to win..." (*Id.* at ¶8), the consistent and corroborated evidence of record before the state court is that while Mr. Larsen thought Petitioner "had a pretty good shot at trial", perhaps as high as an 85% chance of winning as claimed by Petitioner's witnesses, the record supports the conclusion that there was never a guarantee that Petitioner would be acquitted.   "Counsel cannot be required to accurately predict what the jury or court might find..." *Turner,* 281 F.3d at 881.  Thus, "[a]lthough counsel must fully advise the defendant of his options, he is not 'constitutionally defective because he lacked a crystal ball.'" *Liggins v. McDonald,* 2012 WL 2065049, *5 (E.D. Cal. June 6, 2012) (*quoting Turner,* 281 F.3d at 881).

The issue is not whether "'counsel's advice [was] right or wrong, but...whether that advice was within the range of competence demanded of attorneys in criminal cases.'" *Turner,* 281 F.3d at 880 (*quoting McMann,* 397 U.S. at 771).  In other words, the court must inquire whether the advice the petitioner "'received was so incorrect and so insufficient that it undermined his ability to make an intelligent decision about whether to accept the [plea] offer.'" *Id.* (*quoting Day,* 969 F.2d at 43).  Petitioner argues that in this case, there was no reasonable prospect of winning at trial given: (1) eyewitness testimony from the victim's brother identifying Petitioner as the shooter; (2) videotape from the AM/PM where the shooting occurred; (3) videotape and security guard testimony from the apartment complex

into which the shooter ran; (4) "eyewitness testimony from the person with whom Petitioner had an altercation just minutes prior to the shooting;"[10] (5) transcripts of telephone calls made by Petitioner from the jail; (6) a note confiscated from Petitioner's cell at the jail; (7) "information provided to the prosecution from a person to whom Petitioner made numerous detailed admissions regarding the shooting incident (prior to being taken into custody)"[11]; (8) "the realistic probability of a highly negative impact on a jury of eyewitness identification, even in the face of legitimate and logical challenges to such identification"; and (9) "eyewitness testimony from the husband and wife who were in a vehicle at the intersection near the location of the shooting who had a verbal and visual interaction with Petitioner immediately prior to the shooting."  (Petition, p. 20).  This is especially so, according to Petitioner, because Mr. Larsen knew but did not tell Petitioner, that: (1) the misidentification defense was "unrealistic and unsupportable"; (2) "eyewitness testimony is extremely persuasive to juries..."; (3) "the deceased victim's brother would be a powerful witness for the State"; (4) "the fact that the failure of the deceased victim's brother to initially admit he had a gun and fired that gun at the person who shot his brother would not necessarily affect a jury's belief in the remainder of his testimony"; (5) the misidentification theory was undermined by statements from witnesses of Petitioner's altercation at Famous Sam's with, presumably Mr. Cervantes, indicating that Petitioner was upset but Mr. Cervantes was not; and (6) even though a witness "to whom Petitioner made damaging admissions", presumably

---

[10]Although Petitioner does not identify this witness by name, review of the closing arguments suggest this witness was Mr. Cervantes.  (*See* NOF, Exh. K).

[11]The Court presumes Petitioner is referring to Mr. Leal.

Mr. Leal, did not testify, the information from Mr. Leal "greatly assist[ed] the State...by 'putting together' the series of events and explaining the connection between what otherwise appeared to be two completely independent incidents." (*Id.* at p. 30).

Petitioner's argument invites the sort of hindsight analysis that the *Strickland* test forbids.  *See Strickland,* 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct , and to evaluate the conduct from counsel's perspective at the time.").   The record before the state court supports the conclusion that Mr. Larsen had  articulable and considered reasons for believing the State's case was weak: Mr. Leal was not going to testify; the State had overlooked a photo of Petitioner's shirt at the crime scene; a lack of evidence in that, as Petitioner's PCR counsel pointed out during the PCR hearing, there was no video[12], no fingerprints, no footprints or other physical evidence linking Petitioner to the shooting[13]; and Mr. Larsen believed the State's witnesses lacked credibility.

The record from April 28, 2005 and May 5, 2005 hearings show that Petitioner knew what information Mr. Leal had provided to the prosecution.  Petitioner now argues that Mr. Leal's information was damaging even without his testimony because it assisted the State in connecting events. That, arguably,  may be so, however, Mr. Larsen was of the belief that the

---

[12]Although Petitioner cites the existence of video of the AM/PM and of an apartment complex where the shooter ran, Petitioner does not dispute that the video failed to link him to the shooting.

[13]The defense's lack of evidence argument also included that there was no DNA or gun connecting Petitioner to the crime.  (NOF, Exh. K, pp. 21, 27-28).

State's case was considerably weaker without Mr. Leal's testimony, and Petitioner rejected the plea only after it became clear that Mr. Leal was not going to testify. Mr. Larsen's position that the state's case was weaker without Mr. Leal's testimony that, among other things, Petitioner admitted to being the shooter, has support in the record given that the prosecution made clear that the plea would be withdrawn if Mr. Leal decided to testify.

Petitioner knew that Mr. Larsen intended to present a misidentification defense by arguing that Mr. Cervantes could have been the shooter. Petitioner argues that such defense was "not supportable and highly unrealistic." (Petition, p. 23). At the PCR hearing, Mr. Larsen testified that, based on conversations with Petitioner, "I had a pretty good idea that...Mr. Cervantes was not the shooter." (Answer, Exh. 8-B, p. 26). Petitioner contends that Mr. Larsen knew he was the shooter and, therefore, a defense that someone else was the shooter was untenable, especially in light of the testimony presented at trial that Mr. Cervantes left the Famous Sam's before the shooting and the eyewitness testimony that Petitioner was the shooter. (Petition, pp. 21-23). Like Mr. Larsen, Petitioner knew that Mr. Cervantes, who had an altercation with Petitioner on the night of the shooting, had also been at the Famous Sam's in the vicinity of the AM/PM that night. (Answer, Exh. 8B, pp. 46-48). Petitioner knew that Mr. Larsen was going to argue misidentification.[14]   (*Id.* at p. 46). In

---

[14]At the PCR hearing, Petitioner testified that Mr. Larsen had thought of misidentification theory:

> [Mr. Larsen is] the one that brought it up. He said that since the police had picked Miguel Cervantes out, thinking that he was me, and that he knew so much about the case, that he was the shooter. And he was trying to cover up his tracks, saying it was me. That–since we both looked the same.

(Petition, Exh. 8-B, p. 46; *see also id.* at pp. 47-48 (Petitioner testified that Mr. Larsen knew "the detectives pulled him [Mr. Cervantes] over thinking he was me", and that Petitioner told Mr. Larsen that Mr. Cervantes had left the Famous Sam's before the shooting occurred.)).

closing argument, Mr. Larsen pointed out that even one of the detectives had confused Mr. Cervantes for Petitioner and, yet, Mr. Cervantes' photo had not been included in the photo line-up. (NOF, Exh, K, pp. 41-43).[15]  Also at closing, both the prosecution and the defense argued forcefully about the reliability and/or unreliability of eyewitness testimony in general and on the specific evidence adduced at trial.  (NOF, Exh. K).  Mr. Larsen cited specific instances of arguable inconsistencies and discrepancies in the eyewitness testimony. (*Id.*).

At the PCR hearing, Mr. Larsen testified that he had discussed with Petitioner the theory of the case in that he would argue misidentification and lack of evidence.  (Petition, Exh. 8-B, pp. 23-24).  Although Petitioner argues that he was not informed of the evidence against him, he testified that he was aware that witnesses would identify him as the shooter, he just did not know the testimony would make "the evidence look real bad." (*Id.* at pp. 56-57).  Petitioner was aware that he had shot someone at the AM/PM where the death occurred. (*Id.* at pp. 44-45 (when Petitioner first contacted Mr. Larsen, he told Mr. Larsen that he had shot a gun, but he did not know "at that time that...I was the one that actually killed the person.")).  Petitioner was aware that Mr. Cervantes had left the Famous Sam's before the shooting.  (*Id.* at p. 48).  Petitioner was also aware that, although Mr. Leal would not be testifying, Mr. Leal had provided the prosecution with damaging information.  (*See* NOF,

---

[15]At the PCR hearing, when PCR counsel pointed out that a witness testified that Mr. Cervantes had left the Famous Sam's on a motorcycle, Mr. Larsen responded that he could not recall that testimony, but such testimony was only one piece of evidence.  (Petition, Exh. 8-B, p.25).  The record also reflects that at closing argument, Mr. Larsen pointed out that Mr. Cervantes initially said he left Famous Sam's on foot.  (NOF, Exh, K, p. 41).

Exh. J, p.4; Petition p. 22). In his Petition, Petitioner mentions a jailhouse note[16] and jailhouse phone calls that were used against him at trial.  This evidence was not discussed at the PCR hearing.  Nor is  there any persuasive argument in the instant matter that this evidence alone, or together with  the other evidence, rendered the state court decision contrary to, or an unreasonable application of *Strickland* and its progeny.

Petitioner also challenges the state court's factual findings.  According to Petitioner, the state court relied on the transcript of the *Donald* hearing "without regard for the subversion of that event in advance by trial counsel's emphatic advice to Petitioner to disregard the plea offer and the Court's offer to appoint separate counsel to advise Petitioner, which was a key element of the post[-]conviction action but wholly unaddressed within the Minute Entry Order disposing of the post[-]conviction action." (Petition, p. 27).  Petitioner also argues that the trial court focused on its exchange with Petitioner at the *Donald* hearing rather than Mr. Larsen's representations to Petitioner.  (*Id.* at pp. 27-28).  Petitioner further argues that the trial court failed to consider Mr. Larsen's confidence in light of Mr. Larsen's knowledge of the evidence against Petitioner and "that there was no viable misidentification defense...." (*Id.*).

The Ninth Circuit has recognized that

where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.

[16]The transcript of the closing argument, reflects that a note found in Petitioner's cell stated: "Ask Jason to testify for me, please.  And to just say he seen [sic] the car leaving the shooting."  (NOF, Exh. K, p. 25).

- 32 -

*Taylor,* 366 F.3d at 1001 (citations omitted).  Additionally, "the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." (*Id.*) (citations omitted).  In considering this latter claim, the habeas court must be

> mindful that the state courts are not required to address every jot and tittle of proof suggested to them nor need they 'make detailed findings addressing all the evidence before them....To fatally undermine the state fact-finding process, and render the resulting finding unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim.  In other words, the evidence in question must be sufficient to support petitioner's claim when considered in the context of the full record bearing on the issue presented in the habeas petition.

(*Id.*).

Petitioner attempts to undermine the state court's fact-finding process by arguing that, contrary to the state court's finding, Mr. Larsen was not credible.  Petitioner also argues that the state court overlooked key evidence.  Petitioner takes issue with Mr. Larsen's position that Petitioner did not want to go to prison.  According to Petitioner, at the PCR hearing:

> [t]rial counsel misstated Petitioner's position with respect to the State's offer of a plea to Manslaughter with a sentencing range of from 7 to 15 years.  Trial counsel first stated that Petitioner's position was that "*He didn't want to go to prison, is the bottom line.  He wavered back and forth as to how he wanted to proceed, but the bottom line was that he didn't want to go to prison.*" *See* [Petition, Exh. 8-B, p. 11]....On cross examination, after being confronted with the fact that Petitioner had previously accepted a plea that included prison time in a prior case[17], a plea that counsel had negotiated for Petitioner, Mr. Larsen initially attempted to evade the issue by stating that, even if Petitioner went to prison on the prior plea, that "*[d]oesn't mean he wanted to go to prison.  See* [*Id.* at p.18]....When pressed with precision, however, Mr. Larsen acknowledged that Petitioner was not unwilling to accept a plea. *See* [*Id.* at p. 19]....

---

[17]The plea entered in the prior matter was to 3½ years in prison followed by probation. (Petition, Exh. 8-B, p. 18).

(Petition, pp. 18-19)(emphasis in original).

At the PCR hearing, PCR counsel asked Mr. Larsen the following:

Q       ...So let's sort of distinguish that.  Your statement earlier that Mr.
        Miramon didn't want to go to prison, so we can clarify it, it's not a
        statement –obviously no one wants to go to prison.  Okay.  But it's not
        a statement to indicate to this court that Mr. Miramon was dead-set that
        he would never enter a plea or sign a plea to go to prison, correct?
A.      [Mr. Larsen]: That's correct.

(Petition, Exh. 8-B, p. 19).   According to Petitioner, the above-exchange "removes all

possibility of the Court inferring that Petitioner was resistant to a reasonable plea that offered

a significant advantage."  (Petition, p. 19).   Petitioner's argument does not support the

conclusion that the trial court inferred that Petitioner was unwilling to accept *any* plea.  The

record is clear, however, that Petitioner unequivocally decided to reject the specific plea at

issue.  Reliance on the transcript of the *Donald* hearing was not erroneous.  In addressing

Petitioner's claim that Mr. Larsen forced him to reject the plea, thus rendering the *Donald*

hearing meaningless, the appellate court noted:

        Not surprisingly, the trial court told defense counsel at the [PCR] evidentiary
        hearing that, "when we went over this in court [at the *Donald* hearing], I put
        in pretty strong terms with Mr. Miramon that even if you think you have a
        slam dunk winner here, things can reverse at trial very quickly. [W]e put this
        pretty bluntly to Mr. Miramon at the time of the hearing."  The court added
        that it was concerned it might "be dealing with Monday morning
        quarterbacking...by Mr. Miramon."

(Answer, Exh,. H, p. 7).   At the *Donald* hearing, the court made sure that Petitioner was

aware that

        no matter how things start out before trial,...things can change during trial.
        And oftentimes people get surprised at the way a trial changes while it's
        underway. So, if you're thinking you've got a slam-dunk winner in this case,
        you understand that that could reverse very quickly, and you are not going to

have an opportunity to change your mind after today; do you understand that? (Petition, Exh. 1-B, p. 9). Petitioner responded that he understood. (*Id.*). Petitioner does not dispute that Mr. Larsen informed him of the plea and its terms as well as the punishment Petitioner faced if he went to trial. The record is clear that when Petitioner rejected the plea, he was made abundantly aware of the consequences of going to trial versus taking the plea and that all he had to do to accept the plea was to say so. (*See* Petition, Exh. 1-B).

Nor did the state court overlook conflicting evidence. The state court recognized Petitioner's position that Mr. Larsen forced him to reject the plea and that Mr. Larsen promised Petitioner and Petitioner's family success at trial based on reasonable doubt created by the misidentification defense and the state's lack of evidence. In assessing Petitioner's argument, the state court cited the testimony and affidavits offered by Petitioner, his brother, and his fiancé. (*See* Answer, Exh. H, p.4 ("the affiants asserted: Miramon trusted Larsen, Larsen insisted Miramon reject the state's plea offer, and Larsen assured Miramon and his family that the case would be 'easy' to win.")).

In sum, review of the record does not support the conclusion that the state court misapprehended or misstated the facts or that the state court failed to consider and weigh relevant evidence. Instead, the instant record supports the conclusion that the state court's factual findings were reasonable. Nor was the state court's decision contrary to, or an unreasonable application of, Federal law. Petitioner was fully advised of his options: he was informed by Mr. Larsen about the plea offer and its terms, and he knew the consequences of

going to trial.[18] As discussed *supra*, Petitioner knew there was no physical evidence connecting him to the shooting. Petitioner knew that law enforcement had mistaken Mr. Cervantes for him and that Mr. Cervantes had also been in the vicinity the night of the shooting. Presumably, given Petitioner's testimony, Petitioner knew that Mr. Cervantes was not the shooter. Petitioner knew that witnesses would testify that Petitioner was the shooter. Petitioner knew that Mr. Leal had provided damaging information to the prosecution.

Further, although Mr. Larsen was confident "it was a pretty decent defense case...," (Petition, Exh. 8-B, p. 13), the consistent and corroborated evidence of record was that Mr. Larsen did not guarantee Petitioner would prevail at trial. "That counsel and [Petitioner] chose to proceed to trial based on counsel's defense strategy and presumably sincere prediction that..." Petitioner had a good chance of prevailing at trial, does not demonstrate that Petitioner was not fully advised of his options. *Turner,* 281 F.3d at 881 (no deficient performance where counsel informed petitioner of the terms of the plea offer, petitioner was aware he could be sentenced to death, petitioner was permitted to consider the offer overnight, and trial counsel agreed with petitioner's decision to reject the plea). In hindsight, Mr. Larsen's opinion appears to have been mistaken. Nonetheless, "[t]rial counsel [is]...not constitutionally defective because he lacked a crystal ball." *Id.* Moreover, the question whether counsel's advice constitutes ineffective assistance of counsel must be determined on the basis of the situation as counsel saw it at the time he gave the advice and not on the basis of a hindsight analysis. *See Strickland,* 466 U.S. at 689. Given *Strickland*'s highly

---

[18]At the *Donald* hearing, the trial court also advised Petitioner about the sentences he faced pursuant to the plea versus the sentences that could be imposed if Petitioner lost at trial.

deferential standard for scrutiny of counsel's performance, it cannot be said on this record

that the state court's decision was contrary to, or an unreasonable application of, clearly

established Federal law.[19]

## III.    CONCLUSION

As set forth above, the state court's decision was not contrary to, nor an unreasonable

application of clearly established Federal law.  Nor was the state court's decision based on

an unreasonable determination of the facts in light of the evidence presented.  Consequently,

Petitioner's claims fail on the merits.

## IV.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court

deny Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) on the merits.

Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure and LRCiv 7.2(e), Rules of Practice of the U.S. District Court for the District of

Arizona, any party may serve and file written objections within fourteen (14) days after being

served with a copy of this Report and Recommendation.  A party may respond to another

party's objections within fourteen (14) days after being served with a copy. Fed.R.Civ.P.

72(b)(2). If objections are filed, the parties should use the following case number: **CV 11-**

**136-TUC-JGZ.**

Failure to file timely objections to any factual or legal determination of the Magistrate

---

[19]Because the state court did not find that Mr. Larsen's representation had been constitutionally deficient, the state court properly omitted consideration of prejudice. *See Strickland,* 466 U.S. at 697-700.

Judge may be deemed a waiver of the party's right to *de novo* review of the issues. *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 4th day of September, 2012.


_____
Héctor C. Estrada
United States Magistrate Judge